Case number 21-3832, Jamie Marquardt versus Nicole Carlton et al. Oral argument is not to exceed 15 minutes per side. Mr. Livingston for the appellant. Good afternoon, Your Honor. My name is William Livingston. I do represent appellant Jamie Marquardt in this First Amendment retaliation action. And I'd like to reserve two minutes of my time for rebuttal. Very well. Thank you. May it please the Court. As this Court is aware, Mr. Marquardt was terminated from his employment from the City of Cleveland Division of Emergency Medical Services on the basis of two Facebook posts that appeared on his Facebook page in February of 2016. Those posts both concern the Tamir Rice incident. The trial court originally granted defendant Apley's motion for summary judgment on Mr. Marquardt's First Amendment retaliation claim because it believed the post did not amount to speech on a matter of public concern and therefore was not entitled to constitutional protection. On appeal, this Court reversed that judgment, holding that the post addressed matters of public concern, which is speech that falls on the highest rung of the hierarchy of the First Amendment. It then remanded the case back to the district court for further proceedings. On remand, the district court again granted defendant Apley's motion for summary judgment, concluding that under the Pickering balancing test, defendant's interest outweighed Marquardt's interest in speaking on matters of public concern. Because the record demonstrates, especially when viewed in a light most favorable to Mr. Marquardt, that there are genuine issues of material fact about the effect of the Facebook posts on the relationship between Mr. Marquardt and his coworkers, discipline at EMS, EMS operations, the EMS mission, and the reasonableness of Commissioner Carlton's prediction for future disruption, the district court's judgment should be reversed. When there are underlying... As far as the disputed issues of material fact go, did you argue to the district court that there were any disputed issues of material fact? I believe we did, Your Honor, yes. I thought you argued for summary judgment before the district court. Correct, but in arguing for summary judgment, we did explain that there was facts that would entitle us to judgment, and we believe the record on both of the briefing and what's in the record today demonstrates there are disputes of fact that should be resolved by a jury. Are you contending that all of the factors under Pickering are disputed issues of material fact on appeal? I believe the four factors that the district court used in its analysis, each one of those factors could be resolved by the jury in favor of plaintiff-appellant. So there's not a single fact that is undisputed at this point? I think there's... Correct, in terms of the four factors that the district court used in its analysis, yes. Let me ask you this. Is the test really whether a juror could decide whether these reasons given were adequate, or is the real test just was the commissioner's judgment a reasonable one? Well, Your Honor, I think the jury has to make findings if there's a dispute of fact regarding the Pickering balancing factors. And so, for instance, with regard to the... The jury doesn't make that decision. The judge makes the decision of whether there are genuine disputes of material fact to go to the jury. Correct, Your Honor, but I believe the record demonstrates there are material disputes. Those underlying disputes have to be resolved before the court can even engage in the Pickering balancing. The Pickering balancing test, that is a question of law. But if there's underlying factual disputes, those disputes have to be resolved by the jury. What are the disputes? What are the most important disputes? There are several important disputes, Your Honor. For instance, with the first factor, is whether the posts are reasonably likely to impair discipline by superiors or harmony among co-workers. The district court concluded that this factor weighed strongly in favor of Appelee's, but there's no evidence of disharmony in the record amongst Mr. Marquardt's co-workers. It's safe to say that we can also look at expected disruption or the possibility of disruption. Correct. And there's no doubt that that influenced the city's decision, correct? Well, I would say that there is no evidence of actual disruption in this case. Right. So I think the city is relying on potential disruption. Right. So it's just the scope, it's just the strength. There's no dispute about the city's basis for terminating your client are the likelihood or threat or potential for disruption. And so you're saying the jury has to decide how likely that was, but the underlying, there's no disagreement over all the reasons he was terminated. And couldn't we say there's enough evidence here to show that no reasonable person would find that there wasn't a fair basis to terminate your client? I don't believe so, Your Honor. For instance, if you turn your attention to the district court's opinion with regard to the third factor, the third factor concerns the ability for Mr. Marquardt to perform his duties as well as the regulation of EMS, their operation. The district court admitted that there was really no evidence with that regard. He just found that it was inconclusive. And so he afforded that factor, which should have weighed to Mr. Marquardt. The thing is, in all these cases, if their basis is we're concerned about what's going to happen, there's never going to be a record because the things won't have happened. Because they terminate the person because they're worried about things that will happen. Correct. So we're never going to have that record in one of these cases, right? No. So we always have to go to a jury? That always is then to go to the jury? No, I disagree with that, Your Honor. And the reason I say that is at the summary judgment stage, the pickering balancing factors have to be submitted by the city through some sort of evidence to substantiate their interests. And so just speculating or saying that there's some prediction in the future without any evidence that it can point to. Well, there's evidence that this is probably maybe other than the Cavs winning the championship, this is the biggest thing that's happened, the most noteworthy thing that's happened in Cleveland in the last 20 years. And there's evidence that they were concerned about, there's evidence that they had concerns about both employee issues and service out in the field and whether there would be pushback on that. So it just feels like in every one of these cases you can say, well, there's other disputed facts, but we kind of know the story. We do know the story, Your Honor, but in this case Mr. Marquardt reported to work for over a month after the posts were published. Commissioner Carlson could have suspended him if she thought that was going to lead to disruption, disharmony, or affect the morale of EMS. She did not exercise that discretion. And over the 30 days that he worked. Isn't this the same period of time where he was claiming he didn't make the posts? Correct, but the record is clear that in the days after the posts where EMS workers were considering it a hot topic among the office to talk about, no one was talking about whether he made the posts. It was on the content of the posts and whether that was provocative or however they were going to view the posts. The question wasn't whether he had made the posts at that time. So the fact that he continued to work, despite the fact that everyone was talking about the posts, without any disruption over 30 days, I think a jury could say that any prediction for future disruption is not a reasonable one. Well, there was the statement from the NAACP that came in, correct? Yes, there was a condemnatory statement by the Cleveland branch of the NAACP that appeared in a news article. But the news article makes clear that it wasn't calling for Mr. Markworth's termination. It wasn't questioning the ability of EMS to render care or act impartially. And that's in stark contrast to what happened in the Bennett case. Bennett v. Metropolitan Government of Nashville in this court, where there were citizen complaints that directly questioned whether the operations of that enterprise could continue in the way that they needed to continue. Did the fact that your client denied making the posts, was that a basis for his termination, that he was not telling the truth? No, Your Honor. The answer to the complaint in this case makes clear that Mr. Markworth was terminated on the basis of the entirety of the posts and for the posts alone, the content that's within them. Doesn't the letter from the commissioner indicate that there was a determination that he was not telling the truth? Correct, but it's clear from, I think, the termination letter that he was dismissed due to the violation of the rules and regulations that were cited, all of which were based on the content of the posts. So you don't think the fact that they found he was not telling the truth had anything to do with his termination? I don't think that's in the record, Your Honor, and I think at this stage of summary judgment, all facts and inferences have to weigh in favor of Mr. Markworth. But the letter itself is in the record, correct? Correct, but I believe in the testimony from Commissioner Carlton, makes clear that the content of the posts was the basis for termination, as well as the answer to the complaint in this case. I want to address the fourth factor of the analysis, whether the speech detracted from the Cleveland EMS's mission. And notably, the post did not reference EMS, nor did Mr. Markworth's Facebook page, nor did he reference that he was an employee of the city of Cleveland. He also disavowed the posts hours after they were published and said that they did not reflect his beliefs. Moreover, Captain Three testified that EMS's reputation was unchanged as a result of the posts, and that testimony is unrebutted in the record. The record is also replete with testimony from Gregory Hyde, as well as Commissioner Carlton, that members of the community are aware EMS workers provide medical services, that citizens accept that care and allow them to render that care regardless of their view of EMS or any of its personnel or any belief that's been espoused by an EMS member. A jury could conclude on these facts that the post did not detract from the city of EMS's mission, which is primarily to provide medical attention. To the extent that Appleese claimed that the post detracted from the EMS mission because of the division's aspirational mission statement, any controversial statement made by an EMS employee could potentially violate that mission statement. Well, that sort of gets the – I mean, these cases all have to be judged in the setting in which the statements were made. And there has not been a more sensitive issue in Cleveland over the last 20 years, I suspect, than the shooting. I mean, incredibly – so I think all – you know, some cases you could be commenting about something that's much lower on – it's of public interest, but much lower on the scale. But at a time these comments were made in Cleveland, this was a very, very sensitive public issue. And we have to consider that, right? I mean, that factor weighs pretty heavily against you. Well, I believe that's a factor that goes into the analysis, but one of the things that Connick teaches in determining the nature of the speech is you look at whether the employee was speaking about the inner workings of the office or a speech on a matter of public concern that is completely unrelated to one's employment. And when you're speaking on a matter of public concern that's unrelated to your employment, the employer has not as much leeway to regulate that speech because it's less likely to impair their operations. But here it was related to the employment, wasn't it? Only in the most peripheral sense, Your Honor. Well, isn't it a duty of the paramedics to take care of their patients? Certainly. And he was advocating to kill the patient. Well, I don't dispute that – That's directly related. Not that EMS has to provide medical services, but I think the post, when you read them in their entirety, it's discussing the Tamir Rice debate, the reaction of the officers, and the public outcry, not anything to do with EMS's response. And I don't think it's fair to say that the issue that Judge Radler described about how sensitive it was in the community had anything to do with EMS. So I do think he was speaking on a matter of public concern that's very much unrelated to EMS and their mission. But we've agreed that it's a matter of public concern. I mean, that was our first opinion, right? Correct. How solely weighing the Pickering balancing factors and whether the district court erred in granting summary judgment on his weighing of those factors. Yes, and, Your Honor, I would note that with regard to the second factor, there was no evidence to support the finding that any close working relationships were hampered. Nevertheless, the district court found that that factor tilted in the defendant's favor. Just as easily, on this record, the jury could have come to the opposite conclusion. And the same with the third factor about whether Mr. Marquardt could perform his duties or whether the regular operation of EMS was affected. So there were certainly not only factual disputes, but we believe the district court did not properly weigh these factors. If there was absence of evidence of disruption, the district court found the factor to be inconclusive or gave that tie to the city, which is not the proper analysis. What's your best case would you say to support your position that this should have properly been a jury issue? I would say that Bennett v. Metropolitan of Nashville, for instance, that case there was much more disruption than what we saw in this case. They actually used provocative language, including the N word, which is I think the most egregious word in the English language. And that case still survived summary judgment and went to a jury. We believe A for Sciari, Mr. Marquardt's case should go to a jury. I see that I'm out of time. Thank you, Mr. Edson. May it please the court, I'm Pat Hoban for EMS Commissioner Nicole Carlton and the City of Cleveland. The commissioner and the City of Cleveland appellants in this case ask that the court affirm the district court's August 17, 2021 decision, which granted summary judgment to the City of Cleveland on the issue of First Amendment retaliation, the issue of a failure to train Commissioner Carlton, and the other issue with regard to reinstatement of appellant as a result of its finding that the City EMS social media policy was constitutionally overbroad and ambiguous. Counsel, let me ask you, what conduct of Marquardt was he terminated for? Judge Bush, he was terminated for the posts, specifically the content of the posts. What about the finding of his not being truthful? Did that have anything to do with the termination decision? So the city exercised discretion in that matter because Mr. Marquardt had said, of course, that he had not made the post that it was some friend of his. In addressing that issue out of the box, what the city did was conduct an investigation through the Officer of Integrity Control, which is a separate entity from EMS. They conducted that investigation over several weeks. They determined that his story was not credible through the pre-disciplinary hearing process, of course, granted to Mr. Marquardt. Let me ask you, if they had found his story was credible, would he have been terminated? If they had found his story was, in fact, credible, I can speculate and say if there was evidence that someone had taken his phone and done this, that he probably would not have been terminated. And is that the reason why he was not terminated during the 30-day period, that they were still investigating whether his story was credible or not? It was investigating his story with regard to someone else taking his phone and making the post. He then had his Loudermill rights, and a pre-disciplinary hearing had to be scheduled with his union representative. And then all that information was reviewed, and a decision was made by Commissioner Carlton. And that took approximately 30 days from beginning to end. And another thing I would mention, Your Honor, on that score, is Mr. Marquardt was a 22, 23-year employee of Cleveland EMS. He had worked closely upon a time in a different assignment with Commissioner Carlton. She did not come to this decision lightly, and gave him the benefit of the doubt and ensured that he had his due process rights before moving forward with a decision to terminate him. I think the district court made some reference to perhaps other incidents that he had been involved in. The record, and I'm sorry to interrupt. Was that part of the decision to terminate him or not? The prior discipline as a matter of the labor contract in place for Mr. Marquardt was too far back to be considered in a subsequent discipline decision. There's a two-year look-back period in the labor contract. So it could not contribute per the contract to a decision to terminate. Okay. How do you distinguish the Nashville case that the opposing counsel realized as analogous to this case? Well, Judge Gilman, I think a fair reading of the Bennett v. Metro decision is, frankly, if we look at what the district court did in the first instance, it was overturned by the Sixth Circuit. They sent two issues to the jury. One was an issue of causation because it was a question about whether the decision was made based on the political nature of Bennett's speech or on the quality of the language, the use of the N-word, as Mr. Livingston referenced. The other was on Pickering balancing. Of course, the jury made its determination finding that the first three factors, there was no likelihood that there would be disruption from them. And on the fourth, particularly as to effect on Metro's mission, that there would be an effect from that. The district court, on the basis of that jury determination, found in favor of Bennett, which Metro appealed. The Sixth Circuit, of course, looked at the various Pickering factors, and I'll say factors established conceptually in Pickering but then codified in Rankin, much differently than the jury did, came out with a different weighting, and I think it is a fair reading to say that the Sixth Circuit had to essentially correct the decision that the jury made upon which the district court relied. I think that is a significant difference. As a matter of fact, and not to quibble, it's the last thing I wish to do at the court, I can't tell you if use of the N-word is massively more offensive to the public, the people of the city of Cleveland, than calling a 12-year-old child who was tragically killed a ghetto rat. I don't know which is worse, and I don't know that as a matter of parsing, it really matters for this case. As the district court found here, the term is offensive to the community. If we look to the Second Circuit's decision in Locuto v. Giuliani, this was an instance where police officers were marching in a white supremacist parade. One of the things the court noted there in upholding the city of New York's decision to terminate those employees was that their activities were a slap in the face, a slight to the very people they were sworn to serve. If we look specifically on the record here as to Commissioner Carlton's motivation for reaching the decision to terminate, she states very clearly, and this comes back to the pledge to the community of the Cleveland EMS that is in the record, which was one of the policies of the department that Mr. Marquardt's posts were found to have violated and a basis for his termination. That EMS pledge of the community states that the EMS service is to provide service to the employees, or to the people of the city of Cleveland, not pass judgment on them and treat them as if they are a member of their family. Well, when an EMS captain, a supervisor, a leader in the EMS system says publicly, and it's distributed to approximately 250... It's actually a really broad argument. Also, the police officers in the prior case, I mean, everything they do could, anything they do in life could offend in some way some population. And so it's like a strict liability. I don't think it's quite as broad as you say because everybody working EMS, yes, it's a public-facing job, and you could probably craft anything they do as, well, it hurts our image with the public because we serve everyone and someone out there doesn't like. It seems like you're swinging a little too far on this one. Well, Judge Riddler, if we come back to... And I'm just getting over a cold. I'm going to get a little hoarse here, and I apologize. If we come back to the language itself, which is really the question, the nature of the language itself, the level of protection that it should have, and these are legal questions. I disagree with Mr. Livingston when he said this holds the highest rung of protection for speech. In fact, the district court found that that is not the case, and case law supports the conclusion that language of this type that uses racial epithets that actually threatens violence against a child, that specific language, does not occupy the highest rung. The context here, which, of course, under Pickering and applying the principles, courts are to look at the manner, time, place, and context of the language in question. The context, Judge Riddler, as you pointed out, is one of the most notable or traumatic incidents in the last two decades to occur in the city of Cleveland. Eighteen months after this happens, while it's still a subject of discussion in the media and among people in the city of Cleveland, an EMS supervisor makes this statement. He makes this statement to other EMS employees who, within hours of seeing it, reported up reporting safety concerns for themselves and concerns, frankly, about the mental state of Mr. Marquardt. It gets reported to supervisors who, again, express, and this is in the deposition testimony of Captain Threak, did you have safety concerns about this language, and his answer is, yes, I did. Because what Mr. Marquardt says, a man who is employed to supervise and to provide life-saving treatment to individuals in the city of Cleveland, is that he wishes, under those circumstances, he had been in a position to kill this child. Now, it doesn't take a doctorate in moral philosophy to come to the conclusion that had the city not acted and terminated his employment, and that he continued to serve in that capacity to provide critical health care, and came across another African-American youth who, perhaps, was injured because of some wrongdoing of his own, that there might be some question about his willingness to provide the highest level of care to that child under those circumstances. This all went into the city's determination with regard to his speech, and that it had to terminate. Do you agree that there was no actual disruption of service or actual disruption in the workplace? Your Honor, pardon me, not to quibble, but the balancing, of course, is a balancing of interests, a balancing of, and I will absolutely answer your question, a balancing of the city's interests against the interests of Mr. Marquardt in the speech. The city has set forth its interests. The city has an interest in subordinate EMS workers. Those are all hypothetical interests, or those are not interests that actually, none of the harm they feared actually materialized. Well, I mean. I thought this was sort of a contested point. Well, it can be a question of degree, and I guess it's one that the city still believes is worth setting a flag on, that it has an interest in its EMS subordinates not reporting violent, disturbing, safety-threatening speech. I understand all that. And that is a concern of the city's, an interest, if you will, perhaps minor. But I will agree that the city's greatest concerns were forward-looking. If it took no action, what would happen down the road? What safety concerns would there be? And, in fact, as to that issue, the record demonstrates, and this was noted by the district court, Gregory Hyde, who is a 30-year paramedic veteran of city EMS, testified under oath, now this was at the labor arbitration regarding termination of Mr. Marquardt, but it was still under oath testimony in the record, that he changed how he conducted himself on scene after the Facebook posts became public. Because he was concerned about what could happen to him if he was in somebody's house, and he noted specifically in his testimony, Cleveland EMS runs with two-member rescue squads. Is this something you submitted in favor, in supporting your summary judgment motion? Yes, it is, Your Honor. And it was specifically, this testimony was specifically cited by the district court in reaching its decision on Pickering Element 4 with regard to effect on EMS's mission. But that's in the record. Did your friend on the other side offer any evidence at all to dispute the predictions or fears or anxieties of the leadership of EMS? Judge Raylard, the evidence, we'll say the argument, there was not specific evidence produced by Mr. Marquardt. What there was was argument that the worst-case scenario had not happened. How to view that evidence, how reasonable those predictions were. But there was nothing he brought in to sort of hard evidence, I guess. This view is about how to interpret those or how valid those concerns are. Yes, Your Honor. In answer to your question, it was interpretive, predictive, or arguments. Really on both sides, it's quite predictive. It is indeed. I mean, in terms of prediction, but of course, you know, the standard confirmed by the Gillis Court is that a public employer can, in fact, look to the future and make a reasonable prediction of what might, what ills, what effects, what disruptions might happen as a result of employee speech. I would also ask this Court, excuse me, to keep in mind, and this goes directly to the idea of applying the Pickering balancing terms, the established principle that a municipal employer gets deference in their decision and their determination as to what would disrupt their operations and what their interests are. It is something that the District Court noted specifically. It is something that the Bennett Court in the two concurrences by Judge Gibbons and Judge Murphy also noted very specifically that a municipal employer is granted deference. Further, I would note, and Judge Radler, this goes to the issue of prediction, it is also established in the law, cited in Bennett, cited in Gillis, in particular by the Sixth Circuit, that a public employer need not wait until there is actual disruption or until there is an interruption of its services before it acts in these cases. I can see that I am out of time. I thank the Court very much for its time today. The City asks for affirmance of the District Court order in its entirety. Thank you. Thank you, Mr. Hoban. Mr. Rubato. Yes, Your Honor. I would first like to address my friend on the other side's argument regarding the testimony of Gregory Hyde. Yes, at his arbitration testimony he did say that he had to be more aware of his surroundings while he was performing his duties, but on deposition, he testified that he always had to be aware and was always on high alert while he was on duty. And so any change or any conclusion that that could be actual disruption is so minimal that I don't think that would outweigh Mr. Marquardt's right to speak on a matter of public concern. If we say it's just a prediction, solely a prediction case, they don't have hard evidence, solely a prediction, and then you predict you think those are poor predictions, I guess, I mean, how do you counter? So the point I said earlier to you, everyone sort of agrees why they made the decision, and there's some assessment of how valid those predictions are or how strong they are. Did you do anything to counter that specifically other than just saying that I disagree? Well, no, Your Honor. I think the fact that Mr. Marquardt did work at EMS for over a month after the posts were published without any incident whatsoever, without any disruption to EMS operation, the total lack of disruption weighs in our favor about the prediction of disruption, whether that's reasonable or not. And I certainly think a jury could come to that conclusion based on the total lack of evidence. It's the state's burden to marshal evidence to substantiate their pickering interests. But in this case, there's a large sample size of Mr. Marquardt reporting to work without any problems with his employees or his ability to do his jobs or in any way affecting EMS. I would also like to correct something that I think may have been misstated. The Bennett case, the jury actually did find that the speech of that case was reasonably likely to affect and cause disharmony amongst close working relationships. So the Sixth Circuit actually, I think, relied on the jury determinations at trial to support its view of the case. So this wasn't a case where it found that the jury got it wrong. It was actually affirming the jury's conclusions that found the district court misinterpreted their import. I see that I'm out of time. So unless there's any other questions, I'll thank the court. Thank you. Thank you, counsel. We'll take the case under submission and the clerk may adjourn the court.